## CHILDERS v. DEDMAN.

1. The charge of the court on the law of prescription' was authorized and properly adjusted to the pleadings and evidence.
2. An unascertained or disputed boundary line between coterminous proprietors may be established by oral agreement, if the agreement be accompanied by actual possession to the agreed line, or is otherwise duly executed.
3. Applying the principles stated in the preceding notes, the verdict for the plaintiff was authorized by the evidence, and the discretion of the trial judge in refusing a new trial will not be controlled.

No. 3735. FEBRUARY 20, 1924.

Complaint for land. Before Judge Tarver. Catoosa superior court. March 17, 1923.

*W. E. & W. G. Mann,* for plaintiff in error.

*M. L. Harris* and *McClure & McClure,* contra.

ATKINSON, J. An action was instituted to recover a strip of land containing seven and one half acres on the east side of lot number 244 in the 28th district and 3d section of Catoosa County. The land was bounded on the east by the original east line of the lot, and extended the full length of that line; on the north by the original north line of the lot; on the south by the original south

line of the lot; on the west by a straight line commencing at a point on the north line nine rods west of the northeast corner of the lot and extending to a point on the south line six rods west of the southeast corner of the lot. The petition alleged prescriptive title based on a chain of three successive deeds, and adverse possession by plaintiff and his predecessors under those deeds for more than seven years. The answer of the defendant denied ·the allegations of the petition, and alleged: "This defendant some six years ago had the line run between the land of plaintiff and this defendant, each paying one half the costs thereof, and the line was established and same was fully agreed to by the plaintiff, and this defendant has been in possession of the lands belonging to this defendant ever since the said line was established and agreed to by the plaintiff and this defendant." The jury returned a verdict for the plaintiff. The defendant's motion for a new trial was overruled, and he excepted.

1, 3. The rulings announced in the first and third headnotes do not require elaboration.

· 2. The grounds relied on for reversal of the judgment refusing a new trial relate mainly to the contention of the defendant that the evidence demanded a finding that a line was established by oral agreement between the plaintiff and defendant as coterminous proprietors, and subsequent possession up to the agreed line. The original east line of the lot (being the line in dispute) was about one half mile in length. The respective predecessors of the plaintiff and defendant had for many years respected, as the true location of the original line, a line that was indicated by an old fence-row. Adherence to this line would include the land in dispute in the plaintiff's lot, but the land would be excluded from the plaintiff's lot if the new surveyed line as contended for by the defendant should be followed. It has been held: "An unascertained or disputed boundary line between coterminous proprietors may be established, (1) by oral agreement, if the agreement be accompanied by actual possession to the agreed line, or is otherwise duly executed; or (2) by acquiescence for seven years by the acts or declarations of the owners of adjoining land, as provided in the Civil Code [1895], § 3247 [1910, § 3821]." *Osteen* v. *Wynn,* 131 *Ga.* 209 (3) (62 S. E. 37, 127 Am. St. R. 212); *Farr* v. *Woolfolk,* 118 *Ga.*

277 (2) (45 S. E. 230); *Hart* v. *Carter,* 150 *Ga.* 289 (103 S. E. 457); *Barfield* v. *Birrick,* 151 *Ga.* 618 (2) (108 S. E. 43).

The testimony of the defendant as a witness in his own behalf may be paraphrased as follows: The reason we ran the line was that stock kept getting on my land. I got a lot of American wire and proposed to plaintiff that I would build half of a wire fence and he the other. Plaintiff replied, "I don't think these lines are right," and "as quick as we get the line run at the right place we will do it." We then agreed to get a surveyor and run the line at our joint expense. We got the surveyor, and he with others ran the line. When the surveying party got down there I proposed to plaintiff to "commence up on top of the hill," and he said "he just wanted 160 rods," and I said "Well, we will go down and measure you off 160 rods and run straight from that, and that will be the line," and he said, "No, if you will measure 160 rods over across the creek," at Mr. Robinson's corner, "I will abide by the line; it don't make any difference where it goes." I said "All right," and we went ahead and ran it. He said, if it run through the meadow of his place, or something, I don't remember exactly, it would be all right. When they got through running the line they put in the corners and we went over to the far corner. I said to him, "Must I plow up to this line?" and he said, "Yes, plow up to the line, and don't get over it," and I told him all right, and I did. I have never gotten over on him since then, except when I rented from him; he has rented me land. I never plowed over it, for I have never tended it. After I got this land, after the processioners ran that line, I cleared some of it up, just a little spot, about sixteen or eighteen feet along the fence, what you might call the fence-row. Since that line was run I think there are on the north end thirty rows of cotton that have been in cultivation since the line was run; the shortest row I guess might be seventy yards long, and then it goes sort of angling with the road out. I couldn't say, never stepped it, something near that. I have never cultivated it myself but one year. I got about fifteen bushels of corn off of it last year; the boys had it in. (On cross-examination) As a tenant of Mr. Fain (plaintiff's grantor) I had lived on the place Mr. Dedman (plaintiff) bought two years. As such tenant I cleaned it up; might have been an acre or two. I worked up to the old fence after

I cleaned it up.—Referring to the new or surveyed line the defendant testified: "I commenced plowing it right straight after we ran the line. I plowed up that part of it. Mr. Dedman has never cultivated a foot of that land since that line was run. I didn't know that he objected to the line until . . I was sued about a year ago. . . He didn't tear down a fence I built there. I never built a fence there and never had one built. Mr. Dedman put up some poles there, and put three wires across part of it, and I cut it aloose and tore it aloose and drug it off down below the line. . . I don't remember that he ever said a word in the world to me about Mr. Stepp any way. I don't see why Mr. Stepp sold the land to me. Mr. Stepp never told me where the line was when he sold to me." As to the sayings and conduct at the time of the survey attributed to the plaintiff in the foregoing testimony the defendant was corroborated by several other witnesses introduced by him.

Relatively to the old line and the question as to establishment of a new line the plaintiff testified: "The way Mr. Childers [the defendant] got possession of this land—he was on the place, had it rented, when I bought it and he showed me over the place, and later on he bought across the creek, from Mr. Stepp and his father, and he wanted me to run a line through the field, and I told him Mr. Stepp told me that was an agreed line between Mr. Hackett and Mr. McClain [predecessors of the respective parties]; so one evening he come to me in the bottoms where I was mowing, that was about four years after I moved to the property, and I told him Mr. Stepp told me that was an agreed line, . . and . . 'Mr. Stepp will be back here in the fall, and we will talk with Mr. Stepp; and if he says that wasn't an agreed line, . . I will let you run the line and let it go where it will;' and he kept on asking me, and in a day or two he met me again, and he said he would pay the processioners if I would let him run a line through there. The corn was green then. I don't remember just what time it was; and I says, 'You can get the processioners and run the line if you want to, and pay for them yourself.' I never paid any of the expenses of running that line. Sometime the next spring somebody told me Bill was tearing down the fence between us, and I went down there and he had two or three panels of the fence tore out, and I says, 'What are you doing down there?' (we were good friends then, and I

hope we will remain good friends) and says, 'I don't want this fence tore out.' I says, 'Mr. Stepp said this was an agreed line.' And later on, I don't know when, he said his son-in-law hauled the rails off and made wood out of them; but I put the fence through the field, and he tore it down; it was a wire fence; I think he helped me string some of the wire. I put it on the old original line; they tell me it had been there for years. I just know it had been there since 1912 when I bought it, and it was an old fence-row, had rail fence there, and it was grown up in trees. I cut down some locusts there I guess a foot through. It was cultivated as near up to the fence or line as you could get for the bushes. It was a good fence we built there; on part of it we put in wire, and on the other part of my pasture we hauled these rails and built it ten or twelve feet high. This is the east original line of lot 244 and runs all the way through the lot." (On cross-examination) "I don't recollect saying that, when they were about to start at a certain place, if they would come up and start about Mr. Wiggins', that I would stand by it if it split my pasture wide open. I don't deny saying it, and I won't affirm. I don't remember what I did say. I know there was something said about it, and they did come up there at Mr. Wiggins' and start, and I went with them and they ran the line. I sort of believe they put up a rock corner there. I think Mr. Childers had two rock corners made, one in the Peters field and one in mine. I don't remember exactly what I said that day about agreeing to it. I don't recollect the agreed line between me and Mr. Childers, and I told Mr. Childers that if Mr. Stepp said the line was the line it would stand where it was, and Mr. Stepp said the old line was the line. I won't say I did or I didn't; but I don't think I told Mr. Childers to plow up to the line but not to cross it. It has been six years ago; and Mr. Childers, I think he has tended it ever since; if he hasn't, some one else has, and he has been cultivating portions of it. I think we cultivated all of the land in dispute but something like a half an acre or three quarters, and Mr. Childers has been cultivating all of it or having it done, with the exception of an acre and a half or two acres on the south. He has plowed up the line the processioners ran six years, and the fence was on Mr. Childers' side according to the line the surveyor and the processioners ran that day, and the only land that he has cultivated since that time has been on his side of the line that

Chapman and the other processioners and the county surveyor ran that day."

J. W. Stepp, one of the defendant's predecessors testified: "I sold the land from the cross fence back east to Mr. Childers, and that fence was always considered the line ever since I knew it; but I didn't tell Mr. Childers that at the time I sold it to him. . . He could see it as well as I could. There used to be a lane there and a fence on both sides of it, but there wasn't but one fence when he was there. I cultivated the land on the east side, and first one and then the other cultivated that on the west side of the fence. . . That land has been cultivated more or less every year for the last twenty years, I know, up until five or six years ago. I left there and don't know what they have done since then. There is no established corner at the south end of that line, but it is said to be right at the corner of the fence where the two fences come together—east and west, and north and south. That is the only trouble I ever heard of about where this line was until this trouble came up." (On cross-examination) "There used to be a lane there, and the fence that was still there was put right in the road there between the fence, sort of made a co-fence out of it; that's what Colonel Hackett told me. Those fences were about twelve or fourteen or sixteen feet apart, but there was no sign of but one fence there when he went there, but it shows yet the fence run the old road, right in the old road. Colonel Hackett and Jack Cooper did that. Colonel Hackett said there was a fence on each side of the lane before that. I never saw them; there was just the one in the road when I went there. I don't know anything about them running the line or anything of that kind; the line had been there ever since old man Rogers owned the place, and no dispute about it."

Marion Stepp, one of defendant's predecessors, testified: "I sold to W. W. Childers, the defendant in this case, seven or eight years ago. I didn't point out the lines to him when I sold to him, and I don't recollect if there was anything said about where that west line ran on my property. . . The old line is on the east side of the disputed strip through there, and the land was cultivated to that old line part of the way. That line, as I first recollect it, there was a fence running there, but they said it wasn't the line. Mr. Hackett [plaintiff's predecessor] owned on the west, and John McClain [defendant's predecessor] owned on the east, and they

moved the fence back east, moved it twice, just turned it over you might say to get it on a good place one time; and the next time we moved it to where they agreed was the line, put it about two rods over, and agreed that was the line. The property that Mr. Hackett owned on the west is the property now that Mr. Dedman claims. It has been about 26 or 27 years since Colonel Hackett and Mr. McClain made this agreed line. I was present and helped build the fence, helped move it. I don't think the south or north corner was located." (On cross-examination) "Colonel Hackett and Mr. McClain didn't know where the line was, and never did have it run; just agreed on it. I don't-know anything about the running of the line between Dedman and Childers."

Under the foregoing evidence the jury was authorized to find that the consent of the plaintiff to the running of a new line contemplated a provisional line that might become effective if the old line was not an established line by agreement of the predecessors of the plaintiff and defendant; and in this view that the conduct and declarations of the plaintiff at the time of the survey contemplated such provision, and were not intended as an unconditional consent to the line that was being surveyed. The jury was also authorized, under the evidence of J. W. Stepp and Marion Stepp, the defendant's predecessors, to find that the old line was an established line between the predecessors of plaintiff and defendant, and consequently that the condition upon which the new line should become effective did not exist. In that view a verdict setting up an agreement between the plaintiff and defendant as to a new line was not demanded. On the question as to possession by the defendant up to the surveyed line alleged in the answer as the manner of perfecting the oral agreement, there was conflict between the testimony of the plaintiff and the testimony of the defendant; and so much of the testimony relating to that question as was uncontroverted was not so positive, unequivocal, and definite as under all the circumstances to demand a finding favorable to the defendant. It follows that, under application of the principles of law quoted above, the evidence did not require a verdict setting up the new line as contended by the defendant. In the circumstances the verdict for the plaintiff was authorized, and the judgment refusing a new trial will be affirmed.

*Judgment affirmed.    All the Justices concur.*